**HUFF–COOK MUTUAL BURIAL ASSO-CIATION, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 68–C–28–A.**

United States District Court,
W. D. Virginia,
Abingdon Division.

June 8, 1971.

---

John Y. Merrell, Annandale, Va., Francis W. Flannagan, Bristol, Va., for plaintiff.

Birg E. Sergent, Asst. U. S. Atty., Roanoke, Va., Hubert M. Doster, Tax Div., Refund Trial Section No. 2, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

WIDENER, District Judge.

This action is brought by the taxpayer, Huff-Cook Mutual Burial Association, Incorporated, pursuant to 28 U.S.C. § 1346, seeking refund of Federal income taxes which are alleged to have been erroneously assessed and collected. The taxpayer contends that the erroneous assessments and collections were made as follows:

| YEAR | AMOUNT |
| --- | --- |
| 1963 | $ 3,883.03 |
| 1964 | 44,775.98 |
| 1965 | 83,404.60 |

Taxpayer is an assessment life insurance company which was organized on

November 17, 1934 under the laws of Virginia. It is a non-stock corporation issuing certificates of membership. Under the provisions of the certificates of membership, the member is required to pay premiums on a monthly basis and is insured for a designated sum payable in cash upon the death of the insured.

On December 16, 1955, the Chief of the Pensions and Exempt Organizations Branch of the Treasury Department notified the taxpayer by letter that it was not exempt from Federal income taxes under 26 U.S.C., § 501(c) (12), as a benevolent life insurance association of a purely local character.

On January 11, 1956, the taxpayer filed a written protest to the revocation of its exemption from Federal income tax. In the letter of protest, the taxpayer stated that its operations were "confined to a small portion of the Bristol Trade Area." On a map attached to the protest, the taxpayer showed its area of operation as being limited to eight counties in Southwest Virginia. All activities were alleged to have been confined to the Commonwealth of Virginia and, with few exceptions, within a fifty mile radius of Bristol, Virginia.

On May 14, 1956, representatives of the taxpayer met with representatives of the U. S. Treasury Department. On May 15, 1956, the taxpayer notified the Treasury Department that taxpayer was ceasing operations in Pulaski County, Virginia. Taxpayer was then left with an area of coverage which included seven Southwest Virginia counties.

On May 23, 1956, the Pensions and Exempt Organizations Branch issued its ruling by a letter to the taxpayer which stated in part:

"The additional information submitted in support of your request for reconsideration discloses that you are organized and operated primarily for the purpose of providing a plan for the payment of funeral expenses of each of your members; that all benefits are paid in cash without limitation as to their use by the beneficiaries;

and that 85 percent or more of your income consists of amounts collected from members for the sole purpose of meeting losses and expenses. Furthermore, your business activities are actually confined to a particular locality in the Southwest part of the State of Virginia, and your members come from that locality.

"It is held, upon reconsideration and in view of the additional information submitted, that you are exempt from Federal income tax as a benevolent life insurance association described in § 501(c) (12) of the Code of 1954. Our ruling of December 16, 1955, is modified to accord with that contained in this ruling."

As required by the ruling of May 23, 1956, the taxpayer filed a Form 990, information return, for each year thereafter, including 1963, 1964, and 1965. On March 23, 1967, after an examination of taxpayer's operations for the years 1963, 1964, and 1965, the District Director of the Internal Revenue Service notified the taxpayer that it no longer qualified as a "Benevolent life insurance association of a purely local character" under § 501(c) (12) of the Internal Revenue Code of 1954. This revocation of exempt status was based upon an examination of the taxpayer's activities which was made by Revenue Agent, Billy Salyer. Salyer examined all policies issued in 1964 to individuals with surnames starting with the letters B, D, and H, a total of 1445 policies. The District Director's letter notified the taxpayer of the result, as follows:

"It was determined that 35 or 2.4% of the 1445 policies examined were issued to persons residing in areas far removed from Bristol, Virginia, such as: New York, Ohio, Illinois, Indiana, Michigan, North Carolina, Maryland, Washington, D. C., West Virginia and in the Northern, Central and Tidewater areas of the State of Virginia."

The revocation of taxpayer's exempt status was made applicable beginning with the calendar year 1963, the earliest year then open under the statute of lim-

itations. The taxpayer challenges the Government's action in revoking its exempt status under 26 U.S.C., § 501(c) (12).

## REVOCATION OF TAX-EXEMPT STATUS

26 U.S.C., § 501, as applicable, states:

"(a) Exemption from taxation.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under § 502, 503, or 504.

* * * * * *

(c) List of exempt organizations.— * * *

(12) Benevolent life insurance associations of a purely local character * * *; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses."

No issue has been made, nor evidence offered, concerning the requirement of § 501(c) (12) that 85 percent or more of the income of the life insurance company must be amounts collected from members for the sole purpose of meeting losses and expenses, and the court treats the fact as conceded. The annual statements of the taxpayer which are in evidence support this finding.

In revoking the taxpayer's § 501 (c) (12) exemption, the District Director relied upon the findings of Agent Salyer that the taxpayer was issuing policies of insurance to persons residing in areas far removed from Bristol, Virginia. Because of these far-reaching activities of the taxpayer, the Director held that the taxpayer was not "of a purely local character" and therefore not exempt from Federal income taxation under the provisions of § 501(c) (12). The court concurs in this holding.

In Revenue Ruling 64–193, the I.R.S. dealt with a life insurance association which was authorized to do business in thirty-two counties in which there were three large metropolitan trade centers. Approximately 99.6 percent of all policies sold were issued to residents of the home office county and two contiguous counties and all business from outside the three county area resulted from inquiries made to the company rather than from solicitation by the company.

In ruling that the company was not "of a purely local character," the I.R.S. held:

"The words 'purely local character' imply a single locality, irrespective of political subdivisions. The important criterion is that the business be transacted, and be authorized to be transacted, in a single community, place or district and not in several localities."

In its brief before this court, the taxpayer challenged the reasoning of Revenue Ruling 64–193, stating:

" * * * Apparently, the writers of Revenue Ruling 64–193 feel that if a policy is written at the home office pursuant to an inquiry received from another area without solicitation, the life insurance company is transacting business in the other area. Such a view is inconsistent with the insurance business. In the absence of solicitation, policies issued on inquiries received from outside the local area constitute business transacted in such local area."

The taxpayer's opinion upon this matter was reflected in the conduct of the company's business activities. At the trial of the case, the following exchange took place between the court and the vice-president of Huff-Cook:

"The Court: Mr. Harmon, answer the question. Have you ever turned down an application—written a letter to the applicant saying, 'We cannot write this insurance because you reside outside our area'?"

"The Witness: Not to my knowledge." (Tr. p. 67).

The taxpayer admits that its television advertising is now, and has been since February, 1963, transmitted from a location in Tennessee and viewed in Vir-

ginia, Tennessee, Kentucky, and North Carolina. Joint Exhibit 21, Tr. p. 45.

As indicated by the exchange between the court and the taxpayer's vice-president, set out above, the taxpayer did not refuse applications for insurance from outside its authorized area of operation.

Prior to the trial, the parties agreed to a method of random sampling of the insurance policies written by the taxpayer during the years 1963, 1964, and 1965, and further agreed that such sample would be considered representative of all the policies written in those years. As a result of the sample, Revenue Agent Salyer found that in 1963 approximately three and one-half percent of the policies written by the taxpayer were issued to persons residing outside of the local area. In 1964, the figure was approximately four percent, and in 1965, it was approximately six percent.

The court is not inclined to accept the very restrictive result of Revenue Ruling 64–193, nor does it necessarily accept the taxpayer's contention that "(i)n the absence of solicitation, policies issued on inquiries received from outside the local area constitute business transacted in such local area." The mere physical act of signing a policy within the local area does not convert otherwise prohibited business into "business transacted in such local area."

An attempt is not here made to define exactly what does constitute a "purely local" life insurance association; however, the court finds that, under the circumstances of this case, the taxpayer did not constitute a "purely local" association. In view of the taxpayer's solicitation of business by television advertisements in Tennessee, Kentucky, and North Carolina, as well as in Virginia, and its policy of not refusing business from outside its authorized area, as reflected by the substantial percentages of policies actually issued to non-local customers, the court finds that the taxpayer was not, in fact, an association "of a purely local character" as mentioned in 26 U.S.C., § 501(c) (12).

The holding of the Commissioner revoking the taxpayer's exempt status under 26 U.S.C., § 501(c) (12), is accordingly affirmed.

## THE RETROACTIVE APPLICATION OF THE REVOCATION OF TAXPAYER'S EXEMPT STATUS

■ The taxpayer contends that the District Director abused his discretion and acted contrary to Treasury Department Regulations and Rulings when, on March 23, 1967, he revoked the taxpayer's exempt status effective for calendar years 1963, 1964, and 1965.

The Statement of Procedural Rules dealing with organizations claiming exemption under § 501 of the Code of 1954 states:

"(6) Revocation or modification of exemption rulings or determination letters.

(i) An exemption ruling or determination letter may be revoked or modified by a ruling or determination letter addressed to the organization, or by a Revenue Ruling or other statement published in the Internal Revenue Bulletin. The revocation or modification may be retroactive if the organization omitted or misstated a material fact, *operated in a manner different from that originally represented,* or engaged in a prohibited transaction of the type described in subsection (vii) of this subparagraph." 26 C.F.R. 601.-201(n) (6). (Emphasis supplied).

In its letter of January 11, 1956 protesting the loss of its § 501(c) (12) exemption, the taxpayer stated:

"The taxpayer is a benevolent life insurance association of a purely local character, for its business activities are confined to a particular community, place, or district, viz, the Bristol Trade Area."

Included with its letter to the Commissioner were maps which purported to show the area served by the taxpayer. The area of coverage, which was wholly

within the State of Virginia, included all of Scott, Russell, and Washington Counties and portions of Dickenson, Tazewell, Smyth and Wise Counties, as well as a small area in Pulaski County.

On May 15, 1956, after a conference with the I.R.S., the attorneys for the taxpayer wrote to the Service alleging the following:

" * * * A north-south line on the area served by Huff-Cook will average approximately 30 to 35 miles. The east-west line, however, is more elongated. Running from approximately the center of Smith (sic) County, the area is approximately 70 miles in length. This is the area served by Huff-Cook from the time it was organized in 1934 until approximately 18 months ago, when the company started selling policies in the town of Pulaski, Virginia. Pulaski lies on the extreme east of this area and the east-west line, including Pulaski, is approximately 110 miles. Pulaski is part of the Bristol Trading area.

\* \* \* \* \* \*

"For your further information, *Huff-Cook is ceasing its operations in Pulaski and from henceforth will not sell any policies to residents of Pulaski or Pulaski County* and neither will they reinstate any policies now existing which might lapse in this area." (Emphasis supplied).

In early 1967, while conducting an examination of taxpayer's tax liability for the years 1963, 1964, and 1965, Revenue Agent Billy N. Salyer examined the taxpayers records for 1956 and found that after May 15, 1956, Huff-Cook had issued certificates of membership to three persons residing in Pulaski, Virginia, in direct contradiction to the method of operation which it had represented in its letter of May 15, 1956. Also, as noted above, during the years in question, the taxpayer was advertising outside of the Bristol Trade Area and was accepting applications from outside the area which it had represented as its limited area of operation. It is the opinion of the court that these actions by Huff-Cook fall within the type of conduct which justifies retroactive revocation of an exemption under the Statement of Procedural Rules set forth in 26 C.F.R. 601.201(n)(6), and the court therefore affirms the action of the District Director in retroactively applying the revocation of taxpayer's exempt status.

## TAXPAYER'S LIABILITY UNDER SECTION 801 OF THE CODE OF 1954 and RELATED SECTIONS

The Government now concedes that the taxpayer is not taxable under 26 U.S.C., § 821, as originally asserted in the Notice of Deficiency mailed to the taxpayer on May 12, 1967. The parties are in agreement that the taxpayer is taxable under 26 U.S.C., § 801 and related sections.

Section 801 defines a life insurance company as follows:

"(a) Life insurance company defined. —For purposes of this subtitle, the term 'life insurance company' means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

"(b) Life insurance reserves defined. —

\* \* \* \* \* \*

(3) Assessment companies.—In the case of an assessment life insurance company or association, the term 'life insurance reserves' includes—

(B) any funds maintained under the charter or articles of incorporation or association (or by-laws ap-

proved by a State insurance commissioner) of such company or association, exclusively for the payment of claims arising under certificates of membership or policies issued on the assessment plan and not subject to any other use."

\*   \*   \*   \*   \*   \*

The taxpayer has asserted, without contradiction, that the taxpayer is an assessment life insurance company.

Section 38.1–525 of the Code of Virginia entitled "What companies are assessment plan companies," states:

"Any company organized under the laws of this or any other state of the United States which provides life, accident, or indemnity insurance contracts under which, (1) All indemnities to beneficiaries are in the main provided for either by assessments upon members made when needed by the company, or by payments at a fixed date or dates, but with the right reserved by the company to make additional call or calls:

\*   \*   \*   \*   \*   \*

Shall be held to be a company doing business upon the assessment plan; provided, that such periodical premiums do not include the reserve element of the legal reserve systems of life insurance, defined in § 38.1–432."

Section 38.1–432 of the Code of Virginia requires the maintenance of reserve funds to protect persons insured under policies which have a surrender value. The certificate of membership issued by the taxpayer does not provide for a surrender value and thus the periodic assessments paid to the taxpayer do not include the reserve element of a legal reserve system of life insurance.

The benefits paid to the taxpayer's members are derived mainly from the monthly assessments paid by the members. In addition, Article VII of the taxpayer's by-laws provides:

"The Association shall have the right to cause further and additional assessments to be made against the membership (such assessments to be prorated in amount), as may be necessary, in the opinion of the board of directors, to provide for payment of the obligations of the Association to its deceased member or members."

█ The taxpayer thus comes within the definition of an assessment plan company as set forth in § 38.1–525 of the Code of Virginia, and the court therefore finds that the taxpayer is an assessment life insurance company.

The only point of contention between the taxpayer and the Government in relation to § 801 concerns the amount of funds held by the taxpayer as "life insurance reserves" as that term is used in 26 U.S.C. § 801(b) (3) (B).

█ It is the Government's position that the taxpayer's "life insurance reserves" are limited to the five percent emergency fund which the taxpayer is required to maintain by the laws of Virginia. The taxpayer asserts that all funds which are not used to pay either expenses of the Association or death benefits become additions to its life insurance reserves.

As pointed out by the Government in its brief, the taxpayer concedes that a portion of its reserves was at one time invested in common stock. In August, 1968, when the taxpayer notified the Bureau of Insurance of the State of Virginia that "[A]ll monies received from any source, not used for expenses or payment of benefits, become an addition to the reserve fund" (Joint Exhibit 28), the Bureau of Insurance notified the taxpayer that all investments in common stock were considered to be ineligible investments and therefore should be disposed of. The taxpayer did dispose of the investments questioned by the Bureau.

While investing in common stock may seem to be an act inconsistent with treatment of the fund as a reserve, the fact that the taxpayer notified the Bureau of Insurance that it held all funds not used for the payment of expenses or benefits as a reserve fund, supports the taxpayer's contentions in this action, and cre-

ates an even stronger inference that the funds were so held.

The court feels that any question of the propriety of investments is a matter between the members of the Association (the policyholders) and the directors of the taxpayer. There is no reason to make the policyholders pay for the directors' failure to follow the Virginia law as to permissible investments.

Article VIII of the taxpayer's by-laws provides:

"The Association *shall* accumulate a reserve annually for the protection of all of its certificate holders at the time of their death of not less than five (5) percentum of the gross collections from all members during the preceding twelve months, inclusive of December, provided, however, that such reserve shall not accumulate to more than fifteen (15) percentum of the total benefits provided for in the certificates of membership issued and outstanding.

"All monies derived from assessment *shall* be used for the payments of benefits as hereinabove provided and for all legitimate expenses of the Association, provided, however, that after the first year not more than forty (40) percent of any and all assessments may be used in the payment of commissions or other expenses of the Association." (Italics added).

The total benefits outstanding and fifteen percent thereof on the dates pertinent to this case are as follows:

|  | TOTAL BENEFITS OUTSTANDING | FIFTEEN PERCENT OF TOTAL BENEFITS OUTSTANDING |
| --- | --- | --- |
| December 31, 1963 | $25,598,880.00 | $3,839,832.00 |
| December 31, 1964 | 30,944,988.00 | 4,641,748.20 |
| December 31, 1965 | 38,590,886.00 | 5,788,632.90 |

The maximum amount alleged by the taxpayer, in any of the years in question, to be reserves was $893,769.74 in 1965. Thus, the provision prohibiting the accumulation of reserves in amounts greater than fifteen percent of the total benefits outstanding never became applicable during the years under consideration.

Article VIII uses the word "shall" in enumerating the uses which the taxpayer may make of its funds. The Supreme Court has stated that "[T]he word 'shall' is ordinarily 'the language of command'." Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 430, 91 L.Ed. 436 (1947) citing Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1934).

Applying such an interpretation to the language of Article VIII, the taxpayer is commanded by its by-laws to make the following use of its income:

1. The taxpayer *shall* pay benefits as provided in the by-laws;

2. The taxpayer *shall* pay all legitimate expenses;

3. The taxpayer *shall* accumulate a reserve fund for the protection of its certificate holders.

In Maryland Casualty Company v. United States, 251 U.S. 342, 350, 40 S.Ct. 155, 64 L.Ed. 297 (1920), the term reserve is defined:

"The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set set aside—'reserved'—as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment."

This definition of reserves indicates that investment income earned by the funds held as reserves is not considered as a separate source of income, but rather is an addition to the reserve.

Each year, the taxpayer is required to file an Annual Statement with the Commissioner of Insurance of the Commonwealth of Virginia. The Statements filed by the taxpayer in 1963, 1964, and 1965 are in evidence. None of these Annual Statements indicates that the taxpayer ever made any disbursement of funds other than for legitimate expenses and payment of death benefits.

The by-laws do not allow the taxpayer any area of discretionary spending. If the monies derived from assessments are not used to pay benefits or expenses of the Association, such monies must become an addition to the reserve fund.

The court finds that these were the only uses which the taxpayer did, in fact, make of the funds derived from assessments during the years 1963, 1964, and 1965. Therefore, the amount held by the taxpayer as reserves during these years was equal to the total value of the assets of the taxpayer which remained after the payment of benefits and expenses.

The taxpayer's Forms 990 for each year show that Huff-Cook treated as its reserve an amount equal to its assets less liabilities. On December 31, 1963, the taxpayer's total assets were $573,-874.36; its total liabilities were $26,176.-68; and its net worth, described as "surplus reserves," was $547,697.68. On December 31, 1964, the taxpayer's total assets were $702,931.48; its total liabilities were $33,428.69; and its "surplus reserves" were $669,502.79. On December 31, 1965, the taxpayer's total assets were $933,294.21; its total liabilities were $38,524.47; and its "surplus reserves" were $893,769.74. Having found that the amount of the taxpayer's reserve was equal to the value of all the assets of the taxpayer which remained after the payment of all benefits and expenses, the court finds that, for the years in question, the taxpayer held the following amounts as life insurance reserves:

| 1963 | $547,697.68 |
| 1964 | 669,502.79 |
| 1965 | 893,769.74 |

The above amounts could, as easily and accurately, have been found to be $558,-181.67, $738,863.25, and $954,146.81, as shown on the annual report to the Virginia Commissioner of Insurance, without changing the meaning of this opinion.

The amounts shown as reserves on the U. S. Information tax forms 990 for the years in question, while not exactly the amounts shown as reserves on the Annual Statements filed with the Virginia Commissioner of Insurance, contain the same information. The taxpayer has filed as an exhibit a reconciliation of the differences (Exhibit 29), and the court finds that the reconciliation is a true statement. The court further finds that the differences in the amounts of reserves are due solely to the different methods of reporting required by the two forms. In the Virginia forms, some items are stated separately which are included in lump sum categories in the Federal form. Also, there were differences between the book and market value of securities held by the Association. In any event, no effort was made by the taxpayer to conceal any assets or liabilities of the Association.

The court is of opinion that all the assets of the taxpayer, with the exception of amounts held as prepaid assessments and funds held for the payment of accrued taxes and accrued business expenses, are maintained as a reserve for the payment of death benefits under its policies and therefore qualify as life insurance reserves under 26 U.S.C., § 801(b) (3). The tax liability of the taxpayer for the years 1963, 1964, and 1965 must be recomputed accordingly.

An order is this day entered consistent with this opinion.