ANTON ZABOLOTNY AND BERNEL ZABOLOTNY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4844-87.        Filed September 30, 1991.

---

*Jill S. Rolek,* for the petitioners.

*William I. Miller* and *Judith M. Picken,* for the respondent.

DRENNEN, *Judge:* In notices of deficiency issued to both petitioners, respondent determined identical deficiencies in each of the petitioners' Federal excise taxes as follows:

*Anton Zabolotny*

| Year | First-tier (initial) deficiency | Additions to tax sec. 6651 [1] |
|---|---|---|
| 1981 | $324,095.75 | $81,023.94 |
| 1982 | 324,095.75 | 81,023.94 |
| 1983 | 324,095.75 | 81,023.94 |
| 1984 | 324,095.75 | 81,023.94 |
| 1985 | 324,095.75 | [2]64,819.15 |
| 1986 | 324,095.75 | - - - |

For taxable year ended November 26, 1986, respondent determined a second-tier deficiency of $6,481,915.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] This is the figure that appeared on the front page of both notices of deficiency. The computations attached to the notices both used the figure $81,023.94 for the additions to tax for 1985, as did respondent in his brief. No explanation was given for this discrepancy.

*Bernel Zabolotny*

| Year | First-tier (initial) deficiency | Additions to tax sec. 6651 |
|------|-------------------------------|---------------------------|
| 1981 | $324,095.75 | $81,023.94 |
| 1982 | 324,095.75 | 81,023.94 |
| 1983 | 324,095.75 | 81,023.94 |
| 1984 | 324,095.75 | 81,023.94 |
| 1985 | 324,095.75 | 64,819.15 |
| 1986 | 324,095.75 | - - - |

For taxable year ended November 26, 1986, respondent determined a second-tier deficiency of $6,481,915.

The issues presented for our consideration all involve whether a sale of real estate by petitioners to an employee stock ownership plan was a prohibited transaction giving rise to an excise tax under the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829.[3] More specifically, the issues are: (1) Whether petitioners are disqualified persons under section 4975(e)(2); (2) whether the sale of certain real property by petitioners to an employee stock ownership plan is a prohibited transaction described in section 4975(c); (3) whether the sale of certain real property by petitioners to an employee stock ownership plan is exempt from excise tax under section 4975(d)(13); (4) whether the sale of real property by petitioners was simultaneously corrected pursuant to section 4975(f)(5); and (5) whether an addition to tax under section 6651(a)(1) for failure to file excise tax returns is applicable.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

Petitioners Anton and Bernel Zabolotny are husband and wife. They filed timely joint income tax returns for each of the years 1981 through 1986. At the time the petition in this case was filed, petitioners' legal residence was Killdeer, North Dakota. Before May 20, 1981, petitioners had been engaged in farming operations on 1,205 acres of land which they owned in Billings County and McKenzie County in

[3]All references to ERISA refer to the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829, 29 U.S.C. sec. 1001 (1988).

western North Dakota. During the 1970s petitioners and other neighboring farmers discovered oil on their farm properties. In 1977, petitioners entered into various lease arrangements with Gulf Oil Corp. with respect to the mineral rights to their property. The oil production royalty rights on the property produced revenue in excess of $1 million to $1.5 million annually.

On May 20, 1981, Anton and Bernel Zabolotny and their son, Larry Zabolotny, incorporated petitioners' farming operation under the name Zabolotny Farms, Inc. (Farms, Inc.), in the State of North Dakota.[4] On the date of incorporation, Farms, Inc., issued 670 shares of its stock to both Anton and Bernel Zabolotny, which were the only shares issued as of that date. Starting on April 30, 1982, Anton and Bernel Zabolotny began to gradually transfer their stock in Farms, Inc., such that their overall percentage ownership of the corporation declined progressively to a combined total ownership of 6.97 percent of the stock of the corporation in 1985. The initial directors of Farms, Inc., were Anton Zabolotny, Bernel Zabolotny, and Larry Zabolotny. The officers of the corporation during all the years at issue were Anton Zabolotny, president; Larry Zabolotny, vice president; and Bernel Zabolotny, secretary-treasurer.

On May 20, 1981, Farms, Inc., adopted the Zabolotny Farms, Inc., employee stock ownership plan (ESOP). Petitioners were the initial plan participants. Anton Zabolotny was named as trustee of the ESOP on May 20, 1981, and remained such during all years at issue. A determination letter for the ESOP was requested of the District Director of Internal Revenue on July 21, 1981. On February 1, 1982, a favorable letter was issued which determined that the ESOP was a qualified trust under section 401(a).

In their decision to adopt the ESOP, petitioners relied on the research and tax advice given to them by two practicing certified public accountants, John Henss and David Eckroth. Mr. Henss has a law degree and has been a member of a public accounting firm located in Des Moines,

---

[4]Although the parties have stipulated May 20, 1981, as the incorporation date, we note that the certificate of incorporation of Zabolotny Farms, Inc., indicates an incorporation date of Nov. 3, 1981.

Iowa, since 1972. Mr. Henss was responsible for analyzing the feasibility of petitioners' ESOP prior to its creation, drafting the documents creating the ESOP, compiling the annual financial statements of income for the trust, and administering the ESOP. Mr. Eckroth, with the public accounting firm Pucklich & Eckroth, performed much of the other accounting work for petitioners as individuals, for Farms, Inc., and for the ESOP.

On May 20, 1981, the ESOP purchased from petitioners three tracts of farm land located in McKenzie County and Billings County, North Dakota, together with the mineral rights in the land, in exchange for a joint and survivor private annuity plan established by the ESOP for the benefit of petitioners. This was the same property on which petitioners had been conducting their cattle and wheat farming operations. These three tracts were transferred by petitioners for $6,481,915, which was the approximate present value of future payments to petitioners under the joint and survivor private annuity plan established by the ESOP to be paid to petitioners. It has been stipulated that this purchase price represented adequate consideration and we so find. Annual payments under the joint and survivor arrangement between petitioners and the ESOP were in the amount of $478,615 per year payable on January 1 of each year for the lives of petitioners. Petitioners did not attempt to secure a special exemption from the Secretary of Labor for the sale of the property to the ESOP.

After the purchase of the three tracts from petitioners, on December 31, 1982, the ESOP purchased an additional 568.5 acres of real property located in Dunn County, North Dakota, from Albert Keller and Linda Keller, bringing the plan's total real estate holdings in western North Dakota to 1,773.5 acres. All of that property was located in an area which is sparsely populated. Petitioners introduced evidence to indicate that at the time the plan went into effect, a federally funded gasification plant was to be constructed close to the property which is the subject of this litigation. That plant was supposed to produce substantial Federal funding, but the funding apparently never materialized nor was that plant ever constructed. There was little or no industrial or residential development in western North

Dakota at the time the ESOP purchased the property from petitioners.

On May 20, 1983, Anton Zabolotny, as trustee for the ESOP, entered into a 5-year lease of the surface of the 1,773.5 acres of farm ranch land to Farms, Inc. The ESOP retained the mineral rights. Farms, Inc., was actively engaged in farming the surface rights to the real property. The farming operation was diversified in that both cattle and grain operations were sustained.

The ESOP realized cumulative net income from all sources totaling $4,634,189 during the years ended April 30, 1982, 1983, 1984, and 1985.

The two certified public accountants involved in this case, Mr. Henss and Mr. Eckroth, led petitioners to believe that no taxable event was created by the above transactions for which any Federal excise tax returns would be required to be filed.

On November 21, 1986, respondent issued a notice of deficiency to each petitioner, in the amounts set forth above, determining an excise tax pursuant to section 4975(a). According to the explanation of adjustments attached to the notices of deficiency, the excise tax is on the sale of real property owned by petitioners to the Zabolotny Farms, Inc., employee stock ownership plan which took place on May 20, 1981. Respondent deems that sale to be a prohibited transaction for purposes of the section 4975(a) excise tax which is not excused by any applicable exception.

OPINION

Section 4975, as added to the Internal Revenue Code by Title II of the Employee Retirement Income Security Act of 1974,[5] imposes an excise tax on prohibited transactions. It provides that the tax shall be paid by any disqualified person who participates in a prohibited transaction. The tax is imposed at two levels. Section 4975(a) provides for a mandatory initial tax equal to 5 percent of the amount involved with respect to the prohibited transaction. Section

---

[5]Title I of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 832, sets forth the guidelines of standards governing the establishment and operation of pension plans and also establishes general standards of conduct for plan fiduciaries. Title II of ERISA, 88 Stat. 898, specifically amends the Internal Revenue Code of 1954.

4975(b) imposes an additional tax equal to 100 percent of the amount involved, if the prohibited transaction is not timely corrected. Section 4975(c)(1)(A) provides that, for purposes of the section 4975(a) excise tax, "prohibited transaction" means "any direct or indirect * * * sale or exchange, or leasing, of any property between a plan and a disqualified person."

Section 4975(e)(1) defines "plan" as a trust described in section 401(a). Since the parties here stipulated that the ESOP is such a trust, the first issue for our consideration is whether petitioners were "disqualified persons." Section 4975(e)(2) defines "disqualified person" in terms of certain relationships a person has with a plan.[6] Those relationships include fiduciary, sec. 4975(e)(2)(A); an owner of 50 percent or more of a corporation any of whose employees are covered by the plan, sec. 4975(e)(2)(E); a member of the family of any individual described within certain paragraphs in section 4975(e)(2), sec. 4975(e)(2)(F); and any officer or director of a corporation which, among other things, has employees covered by the plan, sec. 4975(e)(2)(H).

Petitioner Anton Zabolotny was a disqualified person as described in section 4975(e)(2)(A), (E), and (H). As a trustee

---

[6](2) DISQUALIFIED PERSON.—For purposes of this section, the term "disqualified person" means a person who is—
  (A) a fiduciary;
  (B) a person providing services to the plan;
  (C) an employer any of whose employees are covered by the plan;
  (D) an employee organization any of whose members are covered by the plan;
  (E) an owner, direct or indirect, of 50 percent or more of—
      (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,
      (ii) the capital interest or the profits interest of a partnership, or
      (iii) the beneficial interest of a trust or unincorporated enterprise,
which is an employer or an employee organization described in subparagraph (C) or (D);
  (F) a member of the family (as defined in paragraph (6)) of any individual described in subparagraph (A), (B), (C), or (E);
  (G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—
      (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
      (ii) the capital interest or profits interest of such partnership, or
      (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);
  (H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or
  (I) a 10 percent or more (in capital· or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G).

for the plan he had discretionary authority to manage the plan and was thus a fiduciary as described in section 4975(e)(3),[7] thus bringing him within section 4975(e)(2)(A). He was also a 50-percent shareholder of Farms, Inc., which was the corporation whose employees initially participated in the plan, thus bringing him within section 4975(e)(2)(E). Finally, as an officer of Farms, Inc., he falls within section 4975(e)(2)(H). Bernel, like Anton, as an officer and initial 50-percent shareholder of Farms, Inc., falls within section 4975(e)(2)(E) and (H). She is also, as Anton's wife, a family member as described in section 4975(e)(2)(F).

Since petitioners are disqualified persons, the sale of their property to the ESOP was a prohibited transaction under section 4975(c) unless the transaction satisfied an exemption as specified in section 4975(d). Petitioners argue that the transactions qualify for such an exemption under section 4975(d)(13). That section provides that the prohibited transaction restrictions of section 4975(c) shall not apply to any transaction which is exempt from section 406 of ERISA by reason of the exemptions within section 408(e) of ERISA.[8] Section 408(e) of ERISA provides that the prohibitions of section 406 of ERISA shall not apply to the acquisition, sale, or lease by a plan of qualifying employer real property as defined in section 407(d)(4) of ERISA. Section 408(e) of ERISA also provides that, to be exempt, such acquisition, sale, or lease, must be for adequate consideration, no commission must be charged for arranging such transaction, and the plan involved must be an eligible individual account plan as defined in section 407(d)(3) of ERISA. There is no dispute that the latter requirements have been satisfied, but it remains to be decided whether the subject property constituted qualifying employer real property under section 407(d)(4) of ERISA.

Section 407(d)(4) of ERISA defines "qualifying employer real property" as parcels of "employer real property" if a

---

[7](3) FIDUCIARY.—For purposes of this section, the term "fiduciary" means any person who—

(A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

[8]While some of the sections of ERISA were carried over to the Internal Revenue Code, all sections were not. I.R.C. section numbers will be used where appropriate.

Sec. 406 of ERISA, like sec. 4975(c) of the Internal Revenue Code, defines certain prohibited transactions for purposes of ERISA.

substantial number of parcels are dispersed geographically. In addition, each parcel of real property and the improvements on it must be suitable, or adaptable without undue expense, for more than one use. ERISA sec. 407(d)(4)(A) and (B). To qualify under section 407(d)(4) of ERISA, the subject property must first qualify as "employer real property." According to section 407(d)(2) employer real property means "real property which is leased to an employer of employees covered under the plan." ERISA sec. 407(d)(2). Farms, Inc., is such an employer, but the ESOP leased only the surface rights of the property it acquired from petitioners back to Farms, Inc. The mineral rights remained under lease to Gulf Oil. The lease from the ESOP to Farms, Inc., was called a farm lease. It was limited to "agricultural purposes" and was subject to any underlying mineral rights together with appropriate easements for access to such minerals. Nevertheless petitioners argue that this lease qualifies the land under section 407(d)(4) of ERISA.

Respondent argues that only the portion of the subject property attributable to the surface rights can be considered employer real property under the statutory definition. In other words, only that fraction of the property's market value attributable to the surface rights is employer real property which might qualify under section 407(d)(4) of ERISA and thus for exemption. Petitioners concede that mineral rights are separate from surface rights but argue that the lease to Gulf Oil brings the mineral rights within the "employer real property" definition as real property leased to an employer of employees covered by the plan and thus exempt from ERISA section 407(d)(2). Petitioners support this argument by reading section 407(d)(4)(C) of ERISA into section 407(d)(2) of ERISA. The former paragraph, which is part of the definition of qualifying employer real property, states that employer real property will qualify "even if such property is leased to one lessee." ERISA sec. 407(d)(4)(C). To petitioners, that language indicates that real property does not have to be leased solely to an employer of employees covered by the plan to satisfy the definitional requirements of employer real property.

The plain language of the statute does not support petitioners' interpretation of section 407(d)(2) of ERISA.

Section 407(d)(2) of ERISA provides that employer real property is property leased to an employer of employees covered by the plan. ERISA sec. 407(d)(2). Here, only the surface rights were leased to Farms, Inc., and therefore only the surface rights can possibly be ERISA section 407(d)(2) employer real property. Therefore, the mineral rights do not qualify as employer real property as defined in ERISA section 407(d)(2) because they were not leased to Farms, Inc., the employer. However, since the surface rights leased back to Farms, Inc., by the ESOP could be employer real property, we must look further to determine if that portion of the property (the surface rights) is qualifying employer real property, making it eligible for the ERISA section 408(e) exemption from the ERISA prohibited transaction provisions and thus eligible for the section 4975(d)(13) exemption. Employer real property will be considered qualifying employer real property if a substantial number of parcels are dispersed geographically, ERISA sec. 407(d)(4)(A), and if each parcel of the real property and improvements thereon are suitable for more than one use, ERISA sec. 407(d)(4)(B). Petitioners argue that geographic dispersion is in fact met because the property purchased from petitioners by the ESOP was dispersed vertically in that it includes both surface and subsurface rights. Petitioners insist that the term "geographically" differs from the term "topographic" because "geographically" refers to a cross-section of the earth whereas "topographic" refers merely to surface configurations. Petitioners argue that respondent seeks to narrow the definition of the term "geographic" to include only the surface rights of the property purchased by the ESOP.

Petitioners cite *Lambos v. Commissioner,* 88 T.C. 1440 (1987), together with Webster's Dictionary, for the proposition that the term "dispersed geographically" looks to a physical cross-section of any piece of real property. In *Lambos,* taxpayers engaged in a prohibited transaction with a plan and were trying to escape the application of the section 4975(a) excise tax through the section 4975(d)(13) exemption. There, we did not deem three fast food restaurants located in the same county to be dispersed geographically for purposes of section 407(d)(4)(A) of ERISA. We stated:

The Conference report is clear that the geographic dispersion standard (sec. 407(d)(4)(A), ERISA) * * * codified as part of the qualifying employer real property definition are intended to safeguard plan investments against adverse economic conditions peculiar to one area. Geographic dispersement, in the context of congressional intent patently obvious in the ERISA provisions and committee reports, connotes a wide spread range or distribution in varied directions and locations. * * * [88 T.C. at 1449.]

The *Lambos* opinion went on to analyze the economic similarity of the three parcels as insufficient to satisfy geographic dispersement. We can find nothing in *Lambos* to support petitioners' argument that geographic dispersion includes or implies an analysis of various subsurface rights attendant to any specific piece of real property.

The phrase "dispersed geographically" is used in ERISA section 407(d)(4) without definition. There are no regulations on this point. However, the legislative history from ERISA states:

the plan might acquire and lease to the employer multipurpose buildings which are located in different geographical areas. It is intended that the geographic dispersion be sufficient so that adverse economic conditions peculiar to one area would not significantly affect the economic status of the plan as a whole. All of the qualifying real property may be leased to one lessee, which may be the employer or an affiliate of the employer. [H. Rept. 93-1280 (Conf.), at 318 (1974), 1974-3 C.B. 415, 479.]

In expressing concern about "adverse economic conditions" specific to a given area, this excerpt from the legislative history indicates that Congress intended that term to require a number of parcels located in "different geographical areas." Thus, the word "geographically" was more likely than not used in ERISA to mean simply "on a regional basis," as argued by respondent. To read a more technical explanation into the definition of that term seems to go outside the scope of congressional intent. Furthermore, if petitioners' argument were accepted it could conceivably mean that all real property by virtue of separate vertical property interests is geographically dispersed. This would leave the entire statutory provision virtually meaningless.

*Lambos,* as well as the portion of the legislative history excerpted above, highlights the fact that the primary rationale for the geographic dispersement requirement is to

protect the plan from adverse economic conditions peculiar to one area. Here, the properties are located in identical geographic environments. We see nothing in the record to differentiate between the pieces of property sold to the ESOP. All the properties are located in the sparsely populated Badlands of western North Dakota and the record shows that the overall farming operations conducted there were not profitable. Moreover, oil production was responsible for all of the income associated with the subject properties.

Petitioners also look towards the multiple uses of the property as giving rise to geographic dispersion. In this connection, petitioners discuss the use of surface rights for the farming operations and the use of subsurface rights for oil extraction as geographically dispersed endeavors. Petitioners argue that the functional aspects attendant to the subject property exposed it to separate economic pressures, thus satisfying the need for required economic protection outlined in the legislative history. We agree with respondent that this argument confuses geographic dispersion with multiple use, which is a separate requirement for real property to be deemed qualified employer real property. The requirements are stated in the disjunctive. *Rutland v. Commissioner,* 89 T.C. 1137, 1148 (1987). We recognize that section 407(d)(4)(B) of ERISA requires that employer real property be subject to more than one use in order to be characterized as qualified employer real property. However, given our finding that petitioners have not satisfied the geographic dispersion requirement, the subject property cannot be qualified employer real property. Therefore, an examination of section 407(d)(4)(B) of ERISA is unnecessary.

Petitioners also urge us not to characterize this transaction as a prohibited transaction because it was in accord with the "prudent man rule" of section 404(a)(1) of ERISA. We recently rejected such an argument in *Rutland v. Commissioner, supra.* In that case an ESOP purchased real property from the plan participants. Taxpayers argued that they should not be subjected to the excise tax under section 4975(a) for equitable reasons. We flatly rejected that claim and the claim that the plan was improved by the purchase:

In our view, such claims are not relevant in deciding whether the petitioners are liable for the excise taxes in issue. The language and legislative history of ERISA indicate a congressional intention to create, in section 4975(c)(1), a blanket prohibition against certain transactions, regardless of whether the transaction was entered into prudently or in good faith or whether the plan benefited as a result. * * * [*Rutland v. Commissioner*, 89 T.C. at 1146.]

In light of *Rutland*, it seems clear that the legislative framework must be complied with in order to fall within the narrow range of exceptions within the prohibited transactions arena.

*Rutland* drew from *Leib v. Commissioner*, 88 T.C. 1474 (1987), which contained an extensive review of the legislative and judicial concerns surrounding the per se restrictions in the prohibited transaction provisions. As set forth in *Leib*, the underlying rationale for those restrictions was a congressional assumption that certain transactions between certain parties are inherently suspicious and should be disallowed ab initio:

The language and statutory framework of section 4975 indicate an intent to create, in section 4975(c)(1), a blanket prohibition against certain transactions, regardless of how prudent the transaction or whether the plan benefited therefrom, unless the transaction came within a statutory exemption or an administrative exemption had been granted. [*Leib v. Commissioner*, 88 T.C. at 1479.]

In light of *Rutland, Leib*, and the plain language of the statutes, we find it difficult to condone a transaction which clearly falls outside the narrowly carved statutory exceptions to the prohibited transaction provisions. With respect to the mineral rights, we determine that the subject transaction does not concern employer real property because those rights were not leased to Farms, Inc. Sec. 407(d)(2), ERISA. With respect to the farm lease, we determine that the property involved is not qualifying employer real property because such properties are not dispersed geographically. Sec. 407(d)(4)(A), ERISA. Consequently, the subject sale of properties to the ESOP is not exempt by section 4975(d)(13) because those sales do not concern qualifying employer real property as defined in section 407(d)(4) of ERISA as required by section 408(e) of ERISA.

We note, as does respondent, that petitioners could have avoided this litigation through a successful application for a special exemption pursuant to section 4975(c)(2). That section provides for a special exemption procedure by which the Secretary of the Treasury, after consultation and coordination with the Secretary of Labor, may grant a conditional or unconditional exemption from the section 4975(a) excise tax on a disqualified person. Sec. 4975(c)(2). Apparently, petitioners did not avail themselves of this exemption procedure, and cannot now seek its protection.

Finally, petitioners argue that the subject transaction, even if prohibited, was simultaneously corrected and therefore falls outside the reach of the section 4975(a) excise tax. The excise tax on prohibited transactions is imposed for each year (or part thereof) in the taxable period. Sec. 4975(a). The taxable period is the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of three dates, including the date on which correction of the prohibited transaction is completed.[9] Sec. 4975(f)(2). Section 4975(f)(5) defines "correction" as "undoing the transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards." Sec. 4975(f)(5).

For further guidance on the term "correction" we turn to section 53.4941(e)-1, Foundation Excise Tax Regs., which is controlling to the extent such regulation describes terms appearing in both sections 4941(e) and 4975(f). Section 53.4941(e)-1(c)(1), Foundation Excise Tax Regs., provides that "Correction shall be accomplished by undoing the transaction which constituted the act of self-dealing to the extent possible, but in no case shall the resulting financial position of the private foundation be worse than that which it would be if the disqualified person were dealing under the highest fiduciary standards." Sec. 53.4941(e)-1(c)(1), Foundation Excise Tax Regs.

Petitioners argue that correction occurred simultaneously on the purchase date. They support this argument with a

---

[9]See *Adams v. Commissioner,* 70 T.C. 373, supplemented 70 T.C. 446 (1978), supplemented 72 T.C. 81 (1979), affd. without published opinion 688 F.2d 815 (2d Cir. 1982).

citation of the second portion of section 4975(f)(5), which requires that the plan be placed "in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards." Sec. 4975(f)(5). They argue that, since the plan made a substantial profit on the transaction, those fiduciary standards were satisfied and the transaction was immediately corrected, thus ending the taxable period on the date of the prohibited transaction.

We cannot agree with petitioners' reading of section 4975(f)(5). The language of the statute and the applicable regulations clearly look to some affirmative act to effect a correction, rather than to the financial success of the prohibited transaction. In other words, a transaction will not be deemed corrected simply because it turns out to be a good deal. The statute and the regulations look first to rescission of the transaction where possible. Here we are presented with no evidence which would show that rescission is in any way not feasible, such as a previous sale of the property by the plan to a third party. Hence, petitioners have yet to correct the subject transaction. To hold otherwise would effectively subvert the strict statutory guidelines presented by the prohibited transaction provisions. As we have noted previously, see *Rutland v. Commissioner, supra; Leib v. Commissioner, supra,* section 4975(a) levies an excise tax on certain transactions regardless of how prudent the transaction or whether the plan benefited therefrom.

The subject transactions have yet to be corrected within the meaning of section 4975(f)(5). We do not have before us the issue of what it will be necessary for petitioners to do to correct the transaction. The issue before us is whether the sale of the property by petitioners to the ESOP was a prohibited transaction within the meaning of section 4975 as determined by respondent. We hold that it was. Consequently, the first-tier excise tax under section 4975(a) was properly determined, except for an error in computation which counsel for respondent conceded on opening statement. The second-tier tax under section 4975(b) was also properly determined, unless the transaction is "corrected"

within the provisions of the law.[10] See *Adams v. Commissioner*, 70 T.C. 373, supplemented 70 T.C. 446 (1978), supplemented 72 T.C. 81 (1979), affd. without published opinion 688 F.2d 815 (2d Cir. 1982).

Petitioners in their petition claimed error in respondent's determination of additions to tax under section 6651(a)(1) for failure to file excise tax returns. Section 6651(a)(1) imposes an addition to tax for the failure to file a required return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." To avoid the addition to tax, the taxpayer must establish both (1) that the failure to file was due to "reasonable cause," and (2) that the failure did not result from "willful neglect." Sec. 6651(a); *United States v. Boyle*, 469 U.S. 241, 245 (1985).

In general, a taxpayer's duty to file a return when due is a personal, nondelegable duty. Thus, reliance upon an accountant to file is ordinarily no excuse for filing a return beyond the due date. See *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 854 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court. However, the Supreme Court has distinguished the case in which a taxpayer reasonably relies on the substantive tax advice of an accountant or attorney that no return need be filed.

When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. [*United States v. Boyle*, 469 U.S. at 251.]

Similarly, this Court has held that reasonable cause within the meaning of section 6651(a)(1) can be shown by proof that the taxpayer supplied all relevant information to a

---

[10]This appears to be a harsh result in this case because the amounts are so large. However, the legislative history and the language used by Congress suggests that violation of the prohibitions in the law were intended to be treated harshly. To lessen the burden somewhat "corrections" were provided; but petitioners do not appear to have made any effort to correct the transactions here. This Court has decided three cases involving ERISA, *Rutland v. Commissioner*, 89 T.C. 1137 (1987), *Leib v. Commissioner*, 88 T.C. 1474 (1987), and *Lambos v. Commissioner*, 88 T.C. 1440 (1987), none of which can be readily distinguished from this case, in principle at least, and all of which require the conclusion we reach here unless distinguished or overruled. We think the opinions in each of those cases properly applied the law as written by Congress and we find no reason for departing from them now.

competent tax adviser and relied in good faith on the incorrect advice of the adviser that no return was required to be filed. *Marprowear Profit-Sharing Trust v. Commissioner,* 74 T.C. 1086, 1096-1097 (1980); *Coldwater Seafood Corp. v. Commissioner,* 69 T.C. 966, 974 (1978); *West Coast Ice Co. v. Commissioner,* 49 T.C. 345, 351 (1968); *Amo Realty Co. v. Commissioner,* 24 T.C. 812, 817 (1955).

This case can be distinguished from *United States v. Boyle, supra,* because in that case petitioner was aware that an estate tax return had to be filed but he relied on his tax adviser to file it on time. In this case, petitioners relied on the advice of their tax adviser that no taxable transaction had occurred which would require that a tax return be filed.

We find that petitioners have demonstrated reasonable cause sufficient to excuse their failure to file excise tax returns for the years in issue. Although neither party directly argued this issue in their briefs, petitioners presented the testimony of one of their accountants, John Henss, who has a law degree and expertise in the area of employee stock ownership plans. Mr. Henss testified that petitioners relied upon his advice that their sale of property to the employee stock ownership plan was not a prohibited transaction that would give rise to tax under section 4975. Respondent did not contradict Mr. Henss' testimony on this point. Rather, the testimony of respondent's only witness, an I.R.S. agent, indicates that both of the accountants involved in petitioners' case, Mr. Eckroth and Mr. Henss, believed that petitioners' sale of property to the ESOP would not be a prohibited transaction under section 4975, that they advised petitioners with regard to their legal conclusion, and that petitioners relied on their advice by selling the property to the ESOP.[11] Petitioners, who for years made their living as farmers, were not versed in tax matters, especially the law involving employee stock ownership plans and prohibited transactions, which is very complex. *Lambos*

---

[11]We also note that respondent, in his first brief, appears to acknowledge petitioners' reliance on their accountants' advice. On pages 45 and 46 respondent states that:

There was testimony to show that petitioners in this case relied on the advice of David Eckroth, their accountant, and John Henss, a second accountant who was recommended to them by Mr. Eckroth. * * * Even if petitioners were misled into thinking the transactions were permissible, this is no defense. There is no knowledge requirement included in the excise tax provisions.

*v. Commissioner*, 88 T.C. 1440, 1445 (1987). In light of the complexity of this area of tax law, petitioners' accountants' advice that there was no taxable event under section 4975 was not so clearly wrong as to permit an inference that petitioners, in relying on Mr. Henss' and Mr. Eckroth's advice, were negligent or that they deliberately disregarded the law. *Marprowear Profit-Sharing Trust v. Commissioner*, 74 T.C. 1086, 1096-1097 (1980); *Coldwater Seafood Corp. v. Commissioner*, 69 T.C. 966, 971, 974 (1978). Accordingly, we hold that petitioners' failure to file excise tax returns was due to reasonable cause and not to willful neglect within the meaning of section 6651(a)(1).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, SHIELDS, HAMBLEN, COHEN, JACOBS, GERBER, WRIGHT, WELLS, and WHALEN, *JJ.*, agree with the majority opinion.

HALPERN, *J.*, dissents.

---

PARR, *J.*, dissenting: I have joined in the dissents of both Judges Ruwe and Beghe. I agree with Judge Beghe that we should inquire into the qualified status of the trust. However, if the trust should be held qualified, I would agree with Judge Ruwe's opinion on the measure of the excise tax liability.

---

RUWE, *J.*, dissenting: I respectfully disagree with the majority's opinion to the extent it finds that the prohibited transaction has not been "corrected" within the meaning of section 4975(f)(5).

Petitioners are husband and wife who had owned and farmed 1,205 acres located in extreme western North Dakota in a barren, sparsely populated area in the foothills of the Badlands. In the 1970s, oil was discovered on their

property. After the discovery of oil, petitioners entered into mineral lease arrangements with Gulf Oil Corp. in 1977.

In May 1981, when petitioner Anton was 61, petitioners incorporated their farming operations. The corporation simultaneously adopted an employee stock ownership plan (hereinafter referred to as the ESOP). At the same time, petitioners sold their real estate consisting of the 1,205 acres including mineral rights to the ESOP for an annuity worth $6,481,915. On the date of sale, the fair market value of the 1,205 acres was $6,481,915. The value of this real estate was allocable to its use as farmland in the amount of $361,500 and to mineral rights in the amount of $6,120,415. Prior to entering into these transactions, petitioners consulted with professional advisers who determined that the sale of petitioners' farmland to the ESOP was not a prohibited transaction which would give rise to excise tax under section 4975.

At the time petitioners sold their farmland to the ESOP, they were the only beneficiaries of the ESOP. For approximately 2 years after the sale, petitioners remained the only beneficiaries of the ESOP. On April 30, 1983, petitioners terminated their employment with their farming corporation and forfeited their entire interest in the ESOP. (Petitioner Anton's rights in the ESOP would have become 100-percent vested in December 1984.) At approximately the same time, petitioners' three sons became employees of the farming corporation and beneficiaries of the ESOP. Shortly thereafter, petitioners' three daughters also became beneficiaries of the ESOP. Thereafter, all six of petitioners' children shared equally as the only beneficiaries of the ESOP.

As of December 31, 1981, the ESOP had received $703,559.32 in royalty income as a result of owning the real estate. As of April 30, 1982, there had been only $1,500 contributed to the ESOP as employer contributions. However, the real estate had maintained its value and had also produced in excess of $1.3 million in royalty income resulting in a net asset value of the ESOP of $718,121.57. As of April 30, 1983, there was still only $1,500 in employer contributions to the ESOP, the real estate had maintained its value, royalty income for the year had been over $2 million, and the net asset value of the ESOP was then

$2,927,787.93. On April 30, 1986, the value of the real estate was greater than the original purchase price, gross royalty income for the prior 5-year period totaled over $9 million and the net asset value of the ESOP was $5,287,349.27. As of April 30, 1986, cumulative employer contributions for the prior 5-year period totaled only $12,900. To say that the prohibited transaction was beneficial to the ESOP and its beneficiaries would be a gross understatement.

The majority finds that each petitioner is liable for the 5 percent excise tax provided for by section 4975(a) for each of 6 taxable years in an amount of $324,095.75 per year. In addition, because the majority finds that there has been no "correction" within the taxable period, it also determines that the excise tax pursuant to section 4975(b) is applicable and that each petitioner is liable for the second-tier tax in the amount of $6,481,915. Given the particular facts in this case, this result is draconian and, in my opinion, is not required by either the statute or the regulations and produces a result that is contrary to the purpose of the statute. Because I believe a "correction" occurred in the first taxable year, I would hold that petitioners are only liable for the 5-percent first-tier tax for the initial year in which the prohibited transaction occurred.

The purpose of the two-tiered excise tax imposed by section 4975 is to protect the interests of the beneficiaries of plans from being jeopardized by transactions between the plan and a disqualified person. *Rutland v. Commissioner,* 89 T.C. 1137, 1146 (1987); H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 483; S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 111, 173-174. Section 4975(a) provides for a mandatory first-tier tax equal to 5 percent of the amount involved with respect to the prohibited transaction. *Rutland v. Commissioner, supra* at 1143. A failure to "correct" the prohibited transaction within the first taxable year in which the prohibited transaction takes place results in imposition of an additional 5-percent tax for each subsequent taxable year until there is a "correction." If a "correction" is not made prior to the notice of deficiency, the second-tier 100-percent tax is imposed.

Respondent does not dispute that the prohibited transaction was beneficial to the ESOP and its beneficiaries. Respondent argues, however, that Congress intended absolutely to prohibit such transactions; and the mere fact that the transaction was favorable to the ESOP and its beneficiaries does not eliminate application of section 4975. I agree that section 4975(a) automatically applies to a prohibited transaction regardless of whether it benefits the ESOP or was motivated by good intentions and that section 4975 was intended to provide a bright-line test to prohibit any transactions between an ESOP and a disqualified person. *Donovan v. Cunningham*, 716 F.2d 1455, 1464-1465 (5th Cir. 1983); *Rutland v. Commissioner, supra* at 1146. Petitioners' argument that the instant prohibited transaction immediately self-corrected eliminating *any* tax under section 4975(a) is therefore without merit. The tax is predicated upon the prohibited transaction which unquestionably took place.

Congress, however, created provisions for the elimination of the first-tier tax for subsequent taxable years, and also for elimination of the second-tier tax, if there is a correction of the prohibited transaction. Sec. 4975(a), (f). I believe that the particular facts and circumstances in this case show that a "correction," within the meaning of section 4975(f)(5), took place prior to the end of the first taxable year in which the prohibited transaction took place.

Section 4975(f)(5) defines correction as follows:

(5) CORRECTION.—The terms "correction" and "correct" mean, with respect to a prohibited transaction, undoing the transaction *to the extent possible*, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards. [Sec. 4975(f)(5). Emphasis added.]

Respondent's regulations under section 4975 concerning "correction" refer to section 53.4941(e)-1(c), Foundation Excise Tax Regs., which provides that "Correction shall be accomplished by undoing the transaction which constituted the act of self-dealing *to the extent possible.*" (Emphasis added.) Section 53.4941(e)-1(c)(3)(i), Foundation Excise Tax Regs., provides: "In the case of a sale of property to a private foundation by a disqualified person for cash, undoing the transaction *includes, but is not limited to,* requiring

rescission of the sale *where possible."* (Emphasis added.) Respondent's regulations specifically recognize one situation where a correction can be accomplished without any affirmative action to undo the transaction. Section 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs., recognizes that if the plan sells the property to a third party at a price that is greater than either the fair market value of the property on the date of the prohibited transaction or the amount paid to the disqualified person, and the plan's income from the property during the plan's ownership exceeds the income earned from the cash received by the disqualified person, a "correction" will be deemed to have occurred.[1] "This portion of the regulation merely provides a *practical* exception to the general rule of rescission." *Leib v. Commissioner,* 88 T.C. 1474, 1485 (1987). (Emphasis added.)[2]

---

[1]Neither party raises the possibility that the ESOP might be considered to have resold part of the property involved in the prohibited transaction within the meaning of sec. 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs. The fair market value of the property on the date of the prohibited transaction was allocable as follows:

| *Farmland* | *Mineral rights* |
|---|---|
| $361,500 | $6,120,415 |
| (5.58%) | (94.42%) |

The majority opinion pp. 393-394 seems to rely on the fact that the surface rights and mineral rights are two separate types of property. Considering the fact that from Apr. 30, 1981, to April 30, 1986, the ESOP reported $9,226,896.58 in royalty income, it might be argued that property, consisting of the minerals in place, which was acquired in the prohibited transaction, had been sold by the ESOP thereby bringing the instant case within the literal terms of sec. 53.4941(e)-1(c)(3)(ii), Foundation Excise Tax Regs.

[2]Sec. 53.4941(e)-1(c)(3)(i) and (ii), Foundation Excise Tax Regs., provides:

(3) *Sales to foundation.* (i) In the case of a sale of property to a private foundation by a disqualified person for cash, undoing the transaction includes, but is not limited to, requiring rescission of the sale where possible. However, in order to avoid placing the foundation in a position worse than that in which it would be if rescission were not required, the amount received from the disqualified person pursuant to the rescission shall be the greatest of the cash paid to the disqualified person, the fair market value of the property at the time of the original sale, or the fair market value of the property at the time of rescission. In addition to rescission, the disqualified person is required to pay over to the private foundation any net profits he realized after the original sale with respect to the consideration he received from the sale. Thus, for example, the disqualified person must pay over to the foundation any income derived by him from the cash he received from the original sale to the extent such income during the correction period exceeds the income derived by the foundation during the correction period from the property which the disqualified person originally transferred to the foundation.

(ii) If, prior to the end of the correction period, the foundation resells the property in an arm's-length transaction to a bona fide purchaser who is not a disqualified person, no rescission is required. In such case, the disqualified person must pay over to the foundation the excess (if any) of the amount which would have been received from the disqualified person pursuant to subdivision (i) of this subparagraph if rescission had been required over the amount realized by the foundation upon resale of the property. In addition, the disqualified person is required to pay over to the foundation any net profits he realized, as described in subdivision (i) of this subparagraph.

The majority states that the statute and regulations clearly look to some affirmative act to effect correction. I agree that this is generally true. However, as explained above, the statute and regulations have no such literal requirement and recognize that undoing the transaction may not be possible. The regulations set forth a specific situation where a correction can occur even though no affirmative corrective action is taken by the disqualified person. The question is whether there are other situations where undoing the transaction is not possible within the meaning of the statute and whether correction can be effected without an affirmative act. The majority appears to answer in the negative by adopting respondent's position that, absent physical impossibility (i.e., the property is not within the control of either party to the original prohibited transaction), there must be affirmative action to undo the transaction.[3]

The only mandatory requirement for correction is that the post correction financial status of the plan be no worse than if the disqualified person were acting under the highest fiduciary standards. Sec. 4975(f)(5). Neither the majority nor respondent seems to question that this specific mandatory requirement was met. Thus, I think resolution of the issue turns on what Congress intended when it required that the prohibited transaction be undone "to the extent possible."

[3]The majority opinion, p. 400, note 10, cites several cases for support. Those cases may appear, at first blush, to support the majority. I believe each is distinguishable.

In *Rutland v. Commissioner*, 89 T.C. 1137 (1987), the Court again required the undoing of a prohibited transaction before we would recognize that a correction had taken place. As in *Leib*, the taxpayers argued that they had corrected the transaction on an earlier date but they were unable to prove that their attempted rescission had fully protected the interests of the plan beneficiaries.

In *Leib v. Commissioner*, 88 T.C. 1474 (1987), we rejected the taxpayers' arguments that the regulation defining the correction requirements was invalid. The taxpayers in *Leib* had clearly sold property to their plan at an inflated price and were required to compensate the plan in order to effect a correction.

In *Lambos v. Commissioner*, 88 T.C. 1440 (1987), the issue was whether the prohibited transaction was statutorily exempt. There was no controversy or discussion about the legal requirements for a correction within the meaning of sec. 4975(f)(5). *Lambos v. Commissioner*, *supra* at 1445 n.3.

Finally, in the more recent case of *Kadivar v. Commissioner*, T.C. Memo. 1989-404 (not referred to by the majority), we determined that the taxpayer was liable for the sec. 4975 taxes for a prohibited transaction wherein he had borrowed money from the plan. We found that no correction had been made because the taxpayer had clearly not repaid the principal and interest. The interests of the plan beneficiaries clearly had not been safeguarded.

Each of the three cases that deal with the "correction" issue is also distinguishable because at the time of the prohibited transactions there were plan beneficiaries other than the persons against whom the sec. 4975 taxes were determined.

The term "possible" can encompass all that is capable of occurring without regard to rational limitations. However, the term "possible" can have a more limited meaning. "It is also sometimes equivalent to 'practicable' or 'reasonable,' as in some cases where action is required to be taken 'as soon as possible.' " Black's Law Dictionary 1166 (6th ed. 1990). I think it is clear that Congress used the term "possible" in this latter sense. Surely, Congress did not intend to require undoing a transaction without regard to the moral, ethical, legal, and rational consequences.

Petitioners, upon whom the majority would impose these extremely harsh results, were the very people whom the statute was intended to protect—the beneficiaries of the ESOP. Petitioners continued to be the only beneficiaries of the ESOP for approximately 2 years after the transaction. During that time the net asset value of the ESOP increased by over $2 million even though only $1,500 had been contributed to it. The only source for this dramatic increase in value was the asset transferred in the prohibited transaction. Not only were the beneficiaries' interests safeguarded, they were substantially enhanced as a result of the transaction.[4] Once this became clear, nothing salutary could be accomplished by undoing the transaction under these unique circumstances.[5] The statutory objective of safeguarding the rights of the ESOP beneficiaries was achieved prior to December 31, 1981, and it was no longer rational to require a rescission.

On April 30, 1983, petitioners terminated their employment thereby forfeiting their interest in the ESOP, and thereafter their children became the only beneficiaries of the ESOP. The pecuniary benefits accruing to these beneficiaries continued to increase, again, all because of the beneficial nature of the prohibited transaction.

---

[4]When questioned at trial about the effect of the prohibited transaction, respondent's agent admitted that it was beneficial to the ESOP and its beneficiaries:

Q. Did you calculate what the financial position of the ESOP would have been if the transaction in question had not occurred?

A. It would have had very little money in the trust. Contributions I believe ranged from $1000 to $1500 a year. Per person that is.

[5]Respondent does not allege that it was improper for the ESOP to own the real estate in question. The only impropriety alleged by respondent was the fact that the ESOP acquired the property from a disqualified person.

Respondent insists that the facts in this case require a rescission. Respondent's legal position on brief is that the statute and regulations require petitioners to repurchase the property from the plan at its current value no matter how much it has increased in value. This could result in a financial disaster.[6] Respondent argues, nevertheless, that petitioners' failure to repurchase the property results in imposition of both the first- and second-tier tax.[7]

In *Deluxe Check Printers, Inc. v. United States,* 14 Cl. Ct. 782 (1988), revd. on other grounds sub nom. *Deluxe Corp. v. United States,* 885 F.2d 848 (Fed. Cir. 1989), the Claims Court recently rejected the Government's position that a "correction" within the meaning of section 4941(e) required the rescission of a self-dealing transaction. After rejecting the Government's argument, the Claims Court considered the taxpayer's argument that a correction occurred because the prohibited transaction was favorable to the private foundation. The Claims Court, however, found as a fact that the original transaction was not favorable because the foundation received less than fair market value for the stock which it had sold in the prohibited transaction. However, the court then found that a correction had occurred when the foundation was subsequently paid the difference. *Deluxe Check Printers, Inc. v. United States, supra.* The court found that the prohibited transaction was corrected when the foundation was fully compensated. Had the Claims Court found that the foundation received full value initially, there would have been no difference to make up and, arguably, the court would have found that the

---

[6]The revenue agent first informed petitioners of his conclusion that they had engaged in a prohibited transaction in February 1985. Had petitioners rescinded the transaction on that date, in accordance with respondent's regulations, they would have had to purchase the real estate at its value on that date. The plan's records show that the value of the real estate as of Apr. 30, 1984, was $7,794,640 and that the value of the annuity, which petitioners had originally exchanged for the real estate, was $5,910,696. Based on these values, if petitioners had undone the prohibited transaction, the regulations would have required petitioners to pay the difference of $1,883,944 to the plan. In addition, petitioners would still have been liable for first-tier excise taxes for 1981 through 1985 in the total amount of $1,620,478.75, plus interest.

[7]The second-tier 100-percent tax can be avoided by a correction of the prohibited transaction after the majority's opinion in this case is rendered. See sec. 4961. However, if petitioners are required to undo the transaction in accordance with sec. 53.4941(e)-1(c)(3), Foundation Excise Tax Regs., quoted *supra* note 2, they would be required to pay the ESOP the greater of the ESOP's original purchase price for the property or its fair market value at the time of rescission. Unless petitioners' financial position allows them to do this, rescission, within the provisions of the regulations, would be impossible.

prohibited transaction had been corrected immediately under the particular facts in that case. (The definition of what constitutes a "correction" in section 4941(e)(3) is the same as that in section 4975(f)(5).) In the instant case, there is no question that petitioners and the plan engaged in a transaction wherein each received fair market value and that the transaction resulted in favorable results for the plan.[8]

Another indication that Congress intended to achieve commonsense results so long as the plan and its beneficiaries are protected is reflected in section 4975(c)(2), which provides that the Secretary shall establish an exemption procedure to exempt what would otherwise be prohibited transactions from the first- and second-tier tax. The section gives guidance on what should be considered in granting an exemption by requiring that an exemption not be granted unless the Secretary finds it to be—

(A) administratively feasible,
(B) in the interests of the plan and of its participants and beneficiaries, and
(C) protective of the rights of participants and beneficiaries of the plan. [Sec. 4975(c)(2).]

Pursuant to this statutory provision, respondent promulgated Rev. Proc. 75-26, 1975-1 C.B. 722, wherein exemption procedures are established.

Still another indication that Congress intended that the statute be applied in a commonsense manner to avoid

---

[8]Interestingly, respondent's agent indicated that he would have permitted petitioners to "correct" the transaction in a manner that would have been detrimental to the plan's beneficiaries.

THE COURT: If the land was much more valuable at this time than it was when the trust purchased it, what would your recommendation have been, or your requirement have been?

THE WITNESS: Seeing as the family orientation of the plans and the payment was a joint 100 percent survivor annuity, I would have proposed to tear up the annuity, transfer ownership back to the Zabolotnys.

MS. ROLEK: Nothing more, Your Honor.

FURTHER REDIRECT EXAMINATION BY MRS. PICKEN

Q. Can correction occur at this stage?

A. Yes, it can.

Q. What would happen to the second tier tax liability?

A. The second tier tax liability would be eliminated.

It is clear that when respondent began his examination, the value of the asset transferred to the ESOP was more than the value of the annuity for which it was purchased. See *supra* note 6. The disparity would probably be even greater today since the value of the annuity would decrease as petitioners get older. The fact that respondent was, and seemingly still is, willing to accept such an act as a correction, despite the obvious adverse effect on the plan beneficiaries, demonstrates a failure to focus on the primary objective of the statutory scheme which was to protect plan beneficiaries.

draconian results is contained in 29 U.S.C. sec. 1203(a) (1990)[9] wherein it gave "the Secretary of the Treasury * * * authority to waive the imposition of the tax imposed under section 4975(b) [26 U.S.C. sec. 4975(b)] in appropriate cases."

It would appear that petitioners could have met the requirements for exemption in Rev. Proc. 75-26, 1975-1 C.B. 722. The majority seems to agree when it states: "We note, as does respondent, that petitioners could have avoided this litigation through a successful application for a special exemption pursuant to section 4975(c)(2). * * * Apparently, petitioners did not avail themselves of this exemption procedure, and cannot now seek its protection." Majority op. p. 398. It should be pointed out, however, that respondent's revenue procedure specifically provides that its provisions "may be initiated by either Secretary [Treasury or Labor] on his own motion." Rev. Proc. 75-26, sec. 3.01, 1975-1 C.B. 722. Given the particular facts in this case and the explanation by the examining revenue agent of what he would have accepted as a correction, it would seem to have been more rational for respondent to have initiated a special exemption pursuant to the revenue procedure, thereby fully protecting the interests of the beneficiaries and avoiding an unnecessarily harsh result.

Congress did not specify in detail what is required for a correction; neither did Congress specifically preclude a finding that there was a correction under the facts in this case. In *Deluxe Corp. v. United States,* 885 F.2d 848 (Fed. Cir. 1989), revg. *Deluxe Check Printers, Inc. v. United States,* 14 Cl. Ct. 782 (1988), the issue was whether the excise tax under section 4941 on self-dealing transactions applied. A literal reading of the statute led the lower court to hold that the tax applied although the statute did not specifically preclude the taxpayer's interpretation. The Federal Circuit reversed, finding that the lower court's interpretation of the statute did not further the purpose of the statute which, was to protect private foundations. The court stated:

---

[9]Employment Retirement Income Security Act of 1974, Pub. L. 93-406, sec. 3003(a), 88 Stat. 829, 998.

In this matter of statutory interpretation, where the text itself does not clearly exclude alternate interpretations, we look first to the legislative history for illumination of the intent of Congress. See, e.g., *Shriners Hospitals for Crippled Children v. United States,* 862 F.2d 1561, 1563 (Fed. Cir. 1988) (consulting legislative history).

\* \* \* \* \* \* \*

The absence of detail from a statutory text, or Congressional reluctance to legislate for all possible future situations, does not mean that Congress thereby intended to adopt a policy intolerant of adaptive interpretation. It is still the original intent of Congress, as gleaned from the official history and accompanying explanation, to which we look in the first instance. \* \* \*

[*Deluxe Corp. v. United States,* 885 F.2d at 850-851.]

I would find that the initial prohibited transaction was subject to the first-tier 5-percent excise tax. I would further find that there was a "correction" of that transaction because by the end of the first taxable year, the financial interest of the plan beneficiaries was protected beyond any requirements contained in section 4975(f)(5), and it was not rational to rescind the transaction in order to accomplish the objective of the statute, which is to protect the beneficiaries. The extent to which it is rationally possible to undo or rescind is dependent on all of the facts and circumstances. The unique facts in this case, including the substantial benefit to the plan beneficiaries and the fact that this harsh tax and the costs of undoing the transaction would fall on the very people whose interest the tax was intended to protect, make it irrational to require that the transaction be undone. "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71 (1982); *Deluxe Corp. v. United States,* 885 F.2d 848 (Fed. Cir. 1989).

KÖRNER, SWIFT, PARR, and COLVIN, *JJ.,* agree with this dissenting opinion.

———

BEGHE, *J.,* dissenting: I generally share the view of my colleagues that we should not disregard the terms in which the parties have chosen to present their case, and that taxpayers should usually be held to the form of the

transaction they have chosen. However, the unsatisfactory result of the majority decision impels me to look for an alternative characterization of the transaction by which confiscatory liabilities for section 4975 excise taxes may be avoided.[1]

I would reopen the record to receive evidence on the qualification of the trust from its inception. I would also consolidate this case for consideration on an expedited basis with docket No. 22586-90, concerning the qualification of the trust for its fiscal years ended April 30, 1984, 1985, and 1986, discussed below in greater detail (*infra* pp. 424-425) to assure that the Court will be able to enter consistent decisions.[2]

The remainder of this opinion summarizes facts in the record that bear on the qualification of the trust, discusses procedural and substantive tax law issues that must be dealt with under this alternative approach, and sketches the lines of further inquiry. To the extent statements of fact in this opinion are not supported by the record, they should be treated as hypotheses to guide the inquiry in the supplemental evidentiary hearing and legal argument that should be ordered.

*Preliminary Inquiry: Can We Disregard Respondent's Determination?*

As a preliminary matter, we would be required to decide whether respondent's determination letter of February 18,

---

[1] I assume that the majority opinion and Judge Ruwe's dissent have concluded, in line with sec. 4975(f)(1), that the liability for the 5-percent, first-tier tax and the 100-percent, second-tier tax is a joint and several liability with respect to the transaction. On this assumption, petitioners' total liability for the first- and second-tier taxes amounts to $8,426,489.50, rather than $16,852,979, but the amount of the aggregate liability should be clarified on the Rule 155 computation. Whatever the amount of tax, petitioners' total liability, with interest, must be at least double that amount. I also have substantial doubt that there is a practicable way, at this late date, that the prohibited transaction could be corrected by a sale back to petitioners so as to cancel the second-tier tax liability.

[2] Under sec. 6501(g)(2), if a taxpayer files an exempt organization return and is later held to be taxable, the period of limitations on assessment of income taxes runs from the time the erroneous return is filed, provided the return is filed in good faith. Inasmuch as respondent does not appear to have determined that the trust had taxable income in the fiscal years ended Apr. 30, 1982 and 1983, it would appear that respondent has not attempted to revoke his determination that the trust was exempt from income tax for those years, and that the periods of limitation on assessment of the income tax liabilities of the trust for those years have expired. On the other hand, docket No. 22586-90 indicates that respondent has revoked the trust's exemption for its fiscal years ended Apr. 30, 1984, 1985, and 1986 and determined that the trust is liable for income taxes under sec. 641 for those years.

1982,[3] to the effect that the trust at its inception was qualified under section 401(a) and exempt from tax under section 501(a), prevents us from concluding that petitioners, who clearly engaged in a prohibited transaction with the trust if it was so qualified and exempt, are nevertheless not subject to the section 4975 excise taxes on prohibited transactions. To arrive at the answer would require a two-step inquiry: (1) Whether respondent would be entitled to retroactively revoke his determination; and (2) if this question is yes, whether respondent's decision not to revoke the determination, and instead pursue petitioners for the prohibited transaction excise tax liabilities, could be disregarded by this Court as a step in finding that petitioners are not liable for the excise taxes.

(1) In order for a ruling or determination to be immune from retroactive revocation, all the following conditions must have been satisfied: (a) There has been no misstatement or omission of material facts; (b) the facts subsequently developed are not materially different from the facts upon which the ruling was based; (c) there has been no change in the applicable law; (d) the ruling was originally issued with respect to a prospective or proposed transaction; and (e) the taxpayer acted in good faith in reliance upon such ruling and a retroactive revocation would be to his detriment.[4]

A number of these conditions have not been satisfied. The fact that the farmland and oil royalty interests had been transferred to the trust does not appear to have been disclosed in the determination request; this was the omission of a material fact. The determination was not issued with respect to a prospective or proposed transaction; the trust had been formed and the property transferred to it 2 months before petitioners and the trust requested the determination, and more than 8 months before respondent issued the determination letter. Therefore, petitioners and

---

[3]Apparently, the parties' stipulations and the present record do not include a copy of respondent's original determination letter.

[4]Rev. Proc. 80-20, sec. 17.05, 1980-1 C.B. 633, 644 superseded by Rev. Proc. 82-37, 1982-1 C.B. 491. The current version is Rev. Proc. 91-1, sec. 11.05, 1991-1 C.B. 321. With respect to determination letters on qualified plans, Rev. Proc. 80-24, sec. 13.05, 1980-1 C.B. 658, 665-666, incorporating the standards described in the text, appears to have been in effect at the time the determination letter in issue was requested. The current version is Rev. Proc. 90-4, sec. 15.05, 1990-1 C.B. 410, 420.

the trust could not have relied to their detriment on respondent's determination that the trust was a qualified trust. Accordingly, respondent would be free retroactively to revoke his determination letter that the trust under the plan was a qualified trust exempt from Federal income tax.[5]

(2) Section 4975(e)(1) defines the term "plan" subject to the prohibited transactions taxes as—

a trust described in section 401(a) which forms part of a plan * * * which trust or plan is exempt from tax under section 501(a), an individual retirement account described in section 408(a) or an individual retirement annuity described in section 408(b) * * * (or a trust, plan, account, or annuity * * * , which, at any time, has been determined by the Secretary to be such a trust, plan, account * * * ).[6]

The parenthetical phrase is susceptible to more than one interpretation. We are concerned with the possibility that the mere fact that respondent has at any time issued a determination letter, without regard to its validity, means that the application of the prohibited transaction rules and excise taxes cannot be avoided under any circumstances.[7] This interpretation might be supported by the following passage in the legislative history:

In addition, the tax law rules are to continue to apply even if the plan, etc., should later lose its tax qualification. [H. Rept. 93-1280 (1974), 1974-3 C.B. 468.]

A contrary interpretation would require that the Secretary have made a valid initial determination that the trust was qualified.

I believe the Court should be free to disregard respondent's determination if the conditions under which it was issued would render it invalid and unenforceable. This would be particularly appropriate here, where the grantors and all

---

[5]It is well established that when an entity operates contrary to the method of operation described in its request for determination, the Service may retroactively revoke the ruling. See, e.g., *Huff-Cook Mutual Burial Association, Inc. v. United States*, 327 F. Supp. 1209, 1213-1214 (W.D. Va. 1971) (upholding retroactive revocation of exemption determination under sec. 501 (c)(12) because taxpayer operated "in direct contradiction to the method of operation" outlined in its request for determination, beginning almost immediately after it filed the request).

[6]Sec. 4975(e)(1) is in contrast to the private foundation provision, sec. 509(b), which in effect allows a private foundation to escape the coverage of the private foundation prohibited transaction rules if "its status as such is terminated under section 507."

[7]That this would probably be respondent's position is indicated by G.C.M. 39297 (June 28, 1984).

the plan beneficiaries are members of the same family within the meaning of section 4975(e)(2)(F),[8] there are no nonrelated parties in interest, and the omitted facts, if initially disclosed, would have caused respondent to deny the original request for a determination that the trust was qualified.

A case holding that a purported pension trust that had received respondent's approval of its qualified status did not qualify as an exempt trust from its inception is *Lansing v. Commissioner*, T.C. Memo. 1976-313. There, a pension trust purportedly established by an S corporation was held to have lacked sufficient economic reality to be recognized as an entity for tax purposes, where the sole shareholder and officers of the corporation, who were also the sole participants and trustees of the plan, freely and consistently dealt with the trust assets as their own. As a result, the Court denied the deductions claimed by the employer S corporation for contributions to the trust. In *Lansing v. Commissioner, supra*, the initial determination letter on the qualification and exemption of the trust, dated December 14, 1966, had been revoked retroactively by the Commissioner on March 29, 1972.[9]

If it should become clear to the Court, after an additional evidentiary hearing, that there are grounds for retroactive revocation of the determination that the trust was qualified at its inception, would the Court be free to disregard that determination if respondent should choose not to revoke it?[10] We must assume for this purpose that respondent will persist in asserting petitioners' liabilities for the prohibited

---

[8]Sec. 4795(e)(6) provides: "For purposes of paragraph (2)(F), the family of any individual shall include his spouse, ancestor, lineal descendant, and any spouse of a lineal descendant."

[9]The Court in *Lansing* made the following comments on the significance of the determination letter on the prohibited transaction issue:

Respondent does not contend that if a trust existed, the transactions here in issue constituted prohibited transactions under section 503. Section 503(b) does not include trust beneficiaries within the class of persons and organizations with whom the specific transactions are prohibited. Moreover, the statute provides that if a qualified trust has engaged in prohibited transactions, it will be denied exemption but only for years subsequent to the year in which it is notified of the prohibited transactions. Section 503(a)(2).

[*Lansing v. Commissioner*, T.C. Memo. 1976-313, 35 T.C.M. 1421, 1424 n.9, 45 P-H Memo T.C. par. 76,313 at 1400 n.9.]

[10]For an exhaustive history and analysis of respondent's exercise of discretion to revoke private rulings retroactively in the employee plans area, see Slate, "The I.R.S.' Use of Section 7805(b) in the Employee Plan Area: An Analysis," Special Report, Tax Mgmt. (Feb. 13, 1989).

transaction excise taxes on the ground that respondent had originally determined, in response to the trust's request, that the trust was an exempt trust.

On the record before us, and lacking any legal argument on the point by the parties, it may be unclear that we can disregard the determination letter and go our own route. Some possible approaches are set forth below.

We might find, as the facts and law are further developed, that contract law is properly applicable in determining the validity and effect of rulings and determination letters. If the trust failed to implement the transaction properly, as represented, or if material facts were omitted, there would not be a valid contract. Restatement, Contracts 2d, secs. 163-164 (1979). If so, would the determination be void or voidable, and would it matter?

We might alternatively treat the determination letter merely as an administrative interpretation of the statute as applied to the facts specified in the taxpayer's letter. The findings of fact would be subject to "arbitrary and capricious" and "abuse of discretion" standards. 5 U.S.C. sec. 706(2)(A) (1988). Inasmuch as the actual facts seem to resemble only vaguely the facts upon which the determination was granted, the determination may well have been "arbitrary and capricious" and, under this theory, would have no legal effect. If so, it would be an "abuse of discretion" for respondent to continue to rely on an invalid determination as the ground for imposing excise tax liability.

Or it might be more in keeping with the facts to analogize the determination letter to a criminal plea agreement. In both cases, the parties in the case have made a deal, and they are required to honor it. But the judge in a criminal case is not a party to the agreement and is not required to abide by it. See Fed. R. Crim. P. 11(e)(4). Indeed, the judge's role as protector of the public interest in the efficient and equitable administration of justice sometimes requires the judge to act independently of the parties' wishes.

In any event, in order to proceed with the inquiry, we must be able to find that the trust was unqualified at its

inception so as to render respondent's determination invalid for excise tax purposes. To that issue I now turn.

1. *ESOP Status Under Section 409(a)*

The facts disclosed by the majority and dissenting opinions show that the so-called Zabolotny Farms, Inc. employee stock ownership plan (the plan), despite respondent's determination letter, never qualified as an employee stock ownership plan within the meaning of section 409(a).[11]

Section 409(a) defines a "tax credit employee stock ownership plan" as a defined contribution plan which—

(1) meets the requirements of section 401(a),
(2) is designed to invest primarily in employer securities, and
(3) meets the requirements of subsections * * * of this section.

The focus of this first inquiry is on paragraph (2), and the answer is not far to seek; the trust under the plan from inception was not "designed to invest primarily in employer securities." The trust was and is invested primarily in mineral royalty interests that fund the joint life annuity retained by petitioners, with remainder to the children. Cf. *Krabbenhoft v. Commissioner*, 94 T.C. 887 (1990) (Court reviewed), affd. 939 F.2d 529 (8th Cir. 1991); *Lazarus v. Commissioner*, 58 T.C. 854 (1972), affd. 513 F.2d 824 (9th Cir. 1975). Whatever beneficial interests in the stock of Farms, Inc., have vested in the children have not been derived by them as corporate employees accruing service credits under the plan, but as the natural objects of their parents' bounty.

The record discloses that the following events occurred simultaneously, as of May 20, 1981:

(1) Petitioners organized Farms, Inc., ostensibly to conduct the farm operation, and received 1,340 shares of its capital stock;

(2) Farms, Inc. adopted the plan, with petitioner Anton Zabolotny as trustee;

(3) petitioners transferred to the trust under the plan the farmland and mineral rights (burdened and benefited by the royalty agreements with Gulf Oil Corp.) in exchange for

---

[11]In 1981, at the time of the trust's creation, the applicable provision of the Internal Revenue Code of 1954 was designated sec. 409A. Former sec. 409A was redesignated sec. 409 by sec. 491(e)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 852.

their right under an unsecured private annuity contract to receive joint and survivor annuity payments of $478,615 per year from the trust;[12] and

(4) the trust under the plan leased the farmland to Farms, Inc., at an annual rental of $18,075 for 2 years (renewed at $22,095 per year for the next 5 years).

By transferring the mineral royalties and farmland to a purportedly exempt trust on these terms, petitioners appear to have sought to achieve the following income, gift, and estate tax objectives: to avoid current recognition of gain to themselves on the transfer of assets to the trust; to avoid any income taxes on the trust income in excess of the current distributions being used to pay the joint and survivor annuity; by transferring the assets to an exempt trust instead of the corporation, to avoid corporation income taxes on the mineral royalty income (S corporations have been subject to various restrictions on their ability to remain qualified as such if they receive passive royalty income, sec. 1362(d)(3); and to use the facade of an ESOP to pass the remainder interests in the mineral royalties and farmland to the children free of gift and estate taxes.

These objectives appear to overshadow completely any intention to use corporate tax deductions for contributions to an ESOP to facilitate the transfer of corporate stock to the children in their capacities as employees of the corporation.

When they transferred the farmland and mineral rights to the trust, petitioners were the only beneficiaries of the trust (and the only employees of the corporation) and remained so until April 30, 1983. On that date, petitioners terminated their employment with Farms, Inc., and forfeited their entire interest in the plan; of course, they retained their joint life estates in the right to receive annuity payments. During the 5-year period ended April 30, 1986, the trust acquired 17,877 shares of the capital stock of Farms, Inc., 106 shares by contribution from Farms, Inc., and 17,771 by purchase. As a result, petitioners' percentage of stock

---

[12]Using a 10-percent discount rate, the expected return multiples for joint and survivor annuities from sec. 1.72-9, Income Tax Regs. (table II, male age 61, female age 51 or 46), for an annuity of $478,615 per year, the present value of the annuity in 1981 was $4,539,163 or $4,609,221. If the 6-percent discount rate in sec. 20.2031-10, Estate Tax Regs., is used, the present value of the annuity was $6,674,282 or $6,914,604.

ownership in Farms, Inc., was reduced during this period from 100 percent to 6.97 percent, even though the number of shares held by petitioners—1,340—remained constant. In the meantime, petitioners' children had become the sole employees of the corporation and beneficiaries of the trust under the plan.

As of May 20, 1981, at the inception of these arrangements, the value of the mineral rights was 17 times greater than the value of the farmland:

| Farmland | Mineral rights |
|---|---|
| $361,500 | $6,120,415 |
| (5.58%) | [13](94.42%) |

The farming operation, as carried on by Farms, Inc., appears to have been a losing proposition.[14] The Federal corporate income tax return of Farms, Inc., for the taxable year 1984 shows:

| | |
|---|---|
| Taxable loss from operations | ($197,204) |
| Net operating loss deduction | (382,191) |
| Total loss | (579,395) |

For the 5-year period ended April 30, 1986, contributions from Farms, Inc., to the trust under the plan amounted to only $12,900,[15] while the gross royalty income of more than $9 million during this period satisfied the current annuity obligations to petitioners, provided the wherewithal for the trust to purchase the bulk of the capital stock of Farms, Inc., and built up the net liquid asset value of the trust to $5,287,349.27. Clearly, therefore, the overwhelming bulk of the benefits accruing to the children, the current employees

---

[13]The total stipulated value of the real property—$6,481,915—seems to be on the low side. During the initial 5-year period, the trust under the plan received over $9 million of royalty income, was able to satisfy the current annuity obligations, pay $653,000 for stock of Farms, Inc., and accumulate $5,287,349.27 of liquid assets. The current fair market value of the royalty interests would depend on an estimate of the amount of the remaining reserves and current and projected oil prices.

[14]It is unclear whether this is because the farm lease from the trust under the plan to Farms, Inc., is unduly burdensome to Farms, Inc., or whether the farm operation would not produce net income under any circumstances. Portions of Billings, McKenzie, and Dunn Counties in North Dakota appear to be included in an area in which annual predictable rainfall may be insufficient to support commercial ranching and farming operations. See Matthews, "The Poppers and the Plains," N.Y. Times Sunday Magazine 24 (June 24, 1990).

[15]The trust's basis in the 106 contributed shares is said by Joint Exhibit 144-EN to be $5,250. I have not found an explanation for the $7,650 difference between this amount and the total $12,900 of contributions.

of Farms, Inc.,[16] has been derived from the residual value of the royalty payments under the mineral lease, after satisfying the trust's annuity obligation to the grantors, and not from contributions funded by net income or assets generated by the farming operations of the corporation.

The stated purpose of Congress in encouraging the use of ESOPs was to strengthen the free enterprise system by providing, through corporate income tax deductions, for the accelerated generation of corporate funds to facilitate financing the transfer of stock ownership to corporate employees. See S. Rept. 97-144, at 119-123 (1981); S. Rept. 94-36, at 55-60 (1975); 97 Cong. Rec. 17290-17294 (1981) (Statement of Senator Long). This was to be accomplished by allowing corporate income tax deductions for cash contributions to the ESOP to enable the trust to purchase employer stock (or repay the third-party loan to the ESOP that had been used to finance the purchase of employer stock), which was to be distributed or made available to corporate employees under the terms of the ESOP.

These purposes have not been served by the arrangement disclosed by the record. The stock interests transferred for the benefit of the children, which have been made possible through waivers by petitioners of their preemptive rights, and may well have been taxable gifts, are being used as markers to measure the children's rights in the residual values and assets attributable to the mineral royalties. Over the initial 5 years of the trust's existence, contributions by Farms, Inc., to the ESOP have been so insignificant, in comparison with the amount of the trust assets invested in mineral rights and farmland, and the amounts of stock purchased outright by the trust, that the amounts of Farms, Inc., stock acquired with those contributions should be disregarded.

Under the Treasury and Labor Department regulations, a plan constitutes an ESOP only if the plan document specifically states that the plan is "designed to invest primarily in

---

[16]There may also be grounds for concluding that the benefits accruing under the plan to the children do not satisfy the "exclusive benefit" standard. See *infra* pp. 424-425. Two of the daughters appear to reside well beyond reasonable commuting distance from the farm, raising the question whether they are bona fide corporate employees. There is no evidence in the record as to the nature and extent of the services rendered to the corporation by any of the children; these matters should be clarified in the supplemental hearing.

qualifying employer securities." Sec. 54.4975-11(b), Foundation Excise Tax Regs.; 29 C.F.R. sec. 2550.407d-6(b) (1980). These regulations go on to state that an ESOP "may invest part of its assets in other than qualifying employer securities."[17]

It is obvious that the plan has never satisfied this standard.[18] Consistent with the Supreme Court's view in *Malat v. Riddell,* 383 U.S. 569, 572 (1966), I believe that a literal interpretation of the word "primarily" would promote the legislative purpose as gleaned from the legislative history paraphrased above. Accordingly, as used in section 409(a)(2), "primarily" means "of first importance" or "principally." Where, as here, there are only two elements to be considered (employer securities and all other investments), "primarily" must mean a majority. As a correlative proposition, the term "part," as used in the regulations, must mean a portion that is less than 50 percent of the whole and of subordinate importance in the overall scheme for the investment of the assets of the trust under the plan.

The plan does not and cannot satisfy this standard. At all times the value of the plan assets has been primarily attributable to the mineral rights (in which Farms, Inc., has no interest whatsoever). The values of the farmland leased by the trust to Farms, Inc., and of the stock of Farms, Inc. (primarily acquired by purchase rather than through corporate contributions), are relatively insignificant.

On more than one occasion and in a variety of circumstances, the courts have held that a transaction did not satisfy a definitional requirement of the tax statute, so that it did not qualify for beneficial tax treatment. The judicial glosses on the statutory reorganization definition, reading

---

[17]Although the phrase "designed to invest primarily" has not been interpreted by respondent or the courts, it necessarily implies that a trust, in order to qualify as an ESOP, must hold the major portion of its assets in employer securities. See Kaplan, Curtis, and Brown, 354-5th Tax Mgmt., ESOPs A-3. Department of Labor Advisory Opinion No. 83-6 (Jan. 24, 1983) states that the statute does not establish a fixed quantitative standard for the "primarily invested" requirement, but the opinion, which disclosed that a simple majority of the trust assets were invested in employer stock, indicates that holding a majority of the trust assets in employer securities would be necessary as well as sufficient to satisfy the "invested primarily" requirement.

[18]The initial 1981 version of the plan document does not even appear to contain the required statement regarding the primary purpose of investing in employer securities. A second version of the plan, effective Jan. 1, 1984, states: "It is understood that the assets of the plan shall be invested primarily in Qualifying Employer securities." This language was removed from a third version of the plan, effective May 20, 1985.

in the requirements of "business purpose," *Gregory v. Helvering*, 293 U.S. 465 (1935), and "continuity of interest," *Pinellas Ice & Cold Storage Co. v. Commissioner*, 287 U.S. 462 (1933), readily come to mind. See also *Bob Jones University v. United States*, 461 U.S. 574 (1983).

We need not reach so far as the Supreme Court was required to do in order to arrive at the desired results in those cases. In the case at hand, section 409(a)(2) explicitly provides the applicable standard, "designed to invest primarily in employer securities." At its inception, the trust is found wanting as an ESOP.

2. *Qualification of the Trust for Tax-exemption Under Sections 401(a) and 501(a)*

If the plan is not qualified as an ESOP under section 409(a)(2), further inquiry is required to determine whether the trust obtained qualified status and exemption from Federal income tax under the "exclusive benefit" standard of section 401(a). Section 401(a) requires that the trust form part of a "plan of an employer for the exclusive benefit of his employees or their beneficiaries" in order to "constitute a qualified trust" entitled to exemption from income tax under section 501(a). In addition, inasmuch as the plan purported to create an ESOP that satisfied the requirements of section 409(a)(1), the inquiry should also focus on whether the plan was a "defined contribution plan," which section 4975(e)(7) requires to be either "a stock bonus plan which is qualified, or a stock bonus and money purchase pension plan, both of which are qualified under section 401(a)."

It is well settled that sole proprietors or partners are not eligible to participate in a qualified plan designed only to cover common law corporate employees. See *Bentley v. Commissioner*, 14 T.C. 228 (1950), affd. per curiam 184 F.2d 668 (2d Cir. 1950). It does not appear that the plan's adoption of the joint and survivor annuity arrangement under a private annuity contract was for the benefit of petitioners in their capacities as corporate employees. They became entitled to those benefits solely by reason of their asset transfer as grantors of the trust, with retained life estates. Petitioners' decision to terminate their employee status and forfeit their interests under the plan also

indicate that the exclusive benefit standard has not been served. Whatever benefits have accrued to the children, whose status as bona fide corporate employees may also be questionable,[19] were derived primarily from the assets transferred to the trust by petitioners, rather than from contributions to the trust by Farms, Inc., under the stock bonus or money purchase provisions of the plan. The absence of corporate taxable income and paucity of corporate contributions indicates there never was any intention or ability by Farms, Inc., to fund a money purchase plan or stock bonus plan of any consequence.

In these circumstances, it would be more in keeping with reality to treat the trust as a private family trust, and to let the income, gift, and estate tax consequences flow from that characterization.

## Respondent's Inconsistent Positions

Finally, there is another reason why it would be improvident at this time to uphold respondent's statutory notices, particularly the portions determining petitioners' deficiencies in first-tier excise taxes for the taxable years 1984, 1985, and 1986. On July 30, 1990, respondent sent a statutory notice to the trust under the plan, determining that the trust is taxable under section 641 on its royalty and other income for its fiscal years ended April 30, 1984, 1985, and 1986. The trust's income tax deficiencies determined by respondent for these years are substantial:

| Taxable year | Deficiency |
| --- | --- |
| Apr. 30, 1984 | $668,375 |
| Apr. 30, 1985 | 592,196 |
| Apr. 30, 1986 | 762,019 |

The trust has filed a petition with the Court (docket No. 22586-90), to which respondent has filed an answer, but there have been no further proceedings in that case. We do not know at this time the grounds for this determination, nor what administrative action, if any, respondent intends or intended to take for the earlier years.

For purposes of the further inquiry recommended herein, the cases should be consolidated and docket No. 22586-90

---

[19]See *supra* note 16.

considered on an expedited basis. Although respondent may argue that he is entitled to determine liabilities for petitioners' excise taxes and the trust's income taxes for the same periods (see Tech. Adv. Mem. 794001 (May 22, 1979)), I believe respondent's two positions are mutually inconsistent if the trust has been unqualified as an exempt trust from its inception.

### Conclusion

It appears that petitioners fell in among tax advisers who whetted their appetites to exploit the bonanza under their farm by retaining a comfortable life income for themselves and transferring the valuable remainder interest to their children free of income, gift, and estate taxes. The arrangement the advisers created for petitioners is so foreign to the world of ESOPs and qualified pension and profit-sharing plans that the Zabolotny family should not be subjected to the prohibited transaction excise tax regime, which was designed to protect the interests of legitimate corporate employees.

I believe that additional evidence can be developed to support this conclusion, but I would abide the outcome of a supplemental hearing.

PARR, *J.*, agrees with this dissenting opinion.